Argued and submitted May 6, decision of the Court of Appeals affirmed; judgment
of the circuit court vacated September 16, 2004

Terry YANCY,
*Petitioner on Review,*

*v.*

William W. SHATZER,
Portland City Code Hearings Officer;
and City of Portland,
*Respondents on Review.*

(CC 0008-08313; CA A114776; SC S50280)

97 P3d 1161

Thomas M. Christ, of Cosgrave Vergeer Kester LLP, Portland, argued the cause for petitioner on review. With him on the briefs were Ed Johnson and Marc Jolin, Oregon Law Center.

Harry Auerbach, Senior Deputy City Attorney, Portland, argued the cause and filed the briefs for respondents on review.

Roy Pulvers, of Lindsay, Hart, Neil & Weigler, LLP, Portland, filed a brief on behalf of *amicus curiae* Oregon State Bar.

Charles F. Hinkle, Portland, filed a brief on behalf of *amicus curiae* ACLU Foundation of Oregon, Inc.

DE MUNIZ, J.

Balmer, J., specially concurred and filed an opinion, in which Riggs, J., joined.

**DE MUNIZ, J.**

Portland police stopped petitioner Yancy for jaywalking. In the course of that contact, the police searched petitioner and discovered less than an ounce of marijuana. The police then issued petitioner a citation that excluded him from two Portland city parks for a period of 30 days. Petitioner timely appealed to the City of Portland Hearings Officer, which affirmed the exclusion. After the exclusion period had run, petitioner sought to challenge the exclusion citation by means of a writ of review in circuit court. The circuit court rejected petitioner's arguments on the merits. Petitioner appealed. The Court of Appeals observed that the case was moot, because the exclusion period had expired and ordered the circuit court to vacate its judgment and dismiss the matter as moot. *Yancy v. Shatzer*, 185 Or App 704, 705, 60 P3d 1156 (2003). Petitioner sought review in this court. We allowed review to consider whether Oregon courts have the power to consider disputes that, like the present one, are capable of repetition and yet evade review because they became moot at some point in the proceedings. Having considered the question, we conclude that our judicial power does not include the authority to adjudicate cases in which there is no existing controversy. We therefore affirm the decision of the Court of Appeals.

On June 9, 2000, the Portland police stopped petitioner after he left Tom McCall Waterfront Park and proceeded across Front Avenue against a pedestrian "Don't Walk" signal. During that contact, the police searched petitioner and discovered less than an ounce of marijuana. Based on the discovery of the marijuana, the police issued petitioner a citation that excluded him from Waterfront Park and Ankeny Plaza.[1] Under the terms of the exclusion, which took

---

[1] At the time of petitioner's arrest, Portland City Code 20.12.265 (2000) provided:

"In addition to other measures provided for violation of this Code, or any of the laws of the State of Oregon, any peace officer, as defined by ORS 133.005(3), as amended, or any park official or employee * * * may exclude any person who violates any provision of this Code, any City ordinance, [or] any of the laws of the State of Oregon * * * from any park for a period of not more than 30 days.

"A. Written notice shall be given to any person excluded from any City park. Such notice shall specify the dates and places of exclusion. It shall be

effect immediately, petitioner would be subject to arrest for criminal trespass if he were to return to either park within 30 days.

On June 13, 2000, petitioner filed an appeal with the Code Hearings Officer. By June 21, 2000, the hearing date, almost half of the exclusion period had run. The hearings officer upheld the exclusion, citing petitioner's failure to obey the traffic signal.

On July 9, 2000, the exclusion period expired. On August 18, 2000, petitioner filed a petition for a writ of review in the circuit court raising various constitutional challenges to the ordinance. *See* ORS 34.020 (authorizing use of writ by circuit court to review proceedings before inferior tribunal). On September 9, 2000, the City of Portland filed a return to the writ of review, after which the parties briefed and argued the matter. The return addressed petitioner's constitutional arguments on their merits; it did not mention the fact that the 30-day exclusion period had run. On April 20, 2001, the circuit court issued an opinion in which it rejected petitioner's constitutional challenges.

Petitioner appealed to the Court of Appeals. In a per curiam opinion, the Court of Appeals concluded that, because

---

signed by the issuing party. Warning of consequences for failure to comply shall be prominently displayed on the notice.

"B. A person receiving such notice may appeal to the Code Hearings Officer in accordance with the provisions of Chapter 22.10 of this Code to have the written notice rescinded or the period shortened. Notwithstanding the provisions of Section 22.10.030A, the appeal shall be filed within 5 days of receipt of the exclusion notice, unless extended by the Code Hearings Officer for good cause shown.

"C. At any time within the 30 days, a person receiving such notice may apply in writing to the Commissioner in Charge of the Bureau of Parks for a temporary waiver from the effects of the notice for good reason."

On March 21, 2004, the Portland City Council modified the ordinance. In particular, it added the following subsection H:

"If an appeal of the exclusion is timely filed under Subsection F of this Section, the effectiveness of the exclusion shall be stayed, pending the outcome of the appeal. If the exclusion is affirmed, the remaining period of exclusion shall be effective immediately upon the issuance of the Hearing [*sic*] Officer's decision, unless the Hearing's [*sic*] Officer specifies a later date."

Under new subsection H, the stay created by an appeal of an exclusion citation will prevent the matter from becoming moot through expiration of the period of exclusion. The modified ordinance has no application to this case.

the period of exclusion expired on July 9, 2000, the case was moot before the circuit court rendered its judgment. The Court of Appeals therefore remanded the matter to the circuit court with instructions to vacate the judgment and dismiss the writ of review. *Yancy*, 185 Or App at 705. We allowed petitioner's petition for review.

Since the adoption of the Oregon Constitution in 1857, this court, from time to time, has been required to determine whether a matter before it is one that is appropriate for judicial disposition. Historically, this court has described that undertaking as a determination whether a "justiciable controversy" exists. In that regard, this court has stated that "[a] controversy is justiciable, as opposed to abstract, where there is an actual and substantial controversy between parties having adverse legal interests." *Brown v. Oregon State Bar*, 293 Or 446, 449, 648 P2d 1289 (1982). Similarly, this court has observed that justiciability contemplates "that the court's decision in the matter will have some practical effect on the rights of the parties to the controversy." *Brumnett v. PSRB*, 315 Or 402, 405, 848 P2d 1194 (1993). Encompassed within the broad question of justiciability are a constellation of related issues, including standing, ripeness, and mootness. For example, this court has recognized that, even if a case is otherwise justiciable, the court will dismiss it as moot if a "decision no longer will have a practical effect on or concerning the rights of the parties." *Id.* at 406. This court also has observed that "[m]ootness is a species of justiciability, and a court of law exercising the judicial power of the state has authority to decide only justiciable controversies." *First Commerce of America v. Nimbus Center Assoc.*, 329 Or 199, 206, 986 P2d 556 (1999).

Petitioner acknowledges the foregoing authorities, but points out that this court at times has appeared to recognize an exception to the rule against deciding moot cases. For example, in 1947, this court utilized such an exception in *Perry v. Oregon Liquor Commission*, 180 Or 495, 498-99, 177 P2d 406 (1947). In *Perry*, the Oregon Liquor Control Commission (OLCC) suspended a supper club's liquor license for 60 days. A circuit court held that the OLCC had overstepped its authority in suspending the license and reinstated it. The OLCC appealed to this court, but the club

moved to dismiss the appeal, arguing that "the question as to the suspension of the license [is] a moot one—and therefore improper to consider" because the period of suspension already had expired. *Id.* at 498. The court denied the motion, indicating that the court would exercise its discretion to decide a moot question for the guidance of an official administrative agency, if the question involved the public welfare and was likely to arise again in the future. *Id.* at 498-99. In reaching that conclusion, the court did not examine the text and history of the Oregon Constitution, but relied on cases from other jurisdictions. *Id.* at 499. The court reversed the circuit court's decision to lift the suspension of the license. *Id.* at 500-01. Subsequently, this court has followed *Perry* on several occasions. *See, e.g.*, *Stowe v. School Dist. No. 8-C*, 240 Or 526, 528, 402 P2d 740 (1965); *Linklater v. Nyberg*, 234 Or 117, 120, 380 P2d 631 (1963); *Huffman v. Alexander*, 197 Or 283, 333, 253 P2d 289 (1953); *State ex rel. v. Smith et al.*, 197 Or 96, 126, 252 P2d 550 (1953); *State ex rel v. Newbry et al.*, 196 Or 331, 337, 248 P2d 840 (1952); *Oregon State Grange v. McKay*, 193 Or 627, 631, 239 P2d 834 (1952) (illustrating proposition). However, none of those cases purported to analyze this court's statement in *Perry* beyond citing it.

More recently, however, this court has rejected *Perry*'s rationale for deciding moot cases. In *Kay v. David Douglas Sch. Dist. No. 40*, 303 Or 574, 577, 738 P2d 1389 (1987), this court observed that no justiciable controversy existed between the parties when the circuit court entered judgment. Therefore, the court concluded, the case was moot and should have been dismissed. In *Mid-County Future Alt. v. Metro. Area LGBC*, 304 Or 89, 92, 742 P2d 47 (1987), this court asserted that it would not decide moot, nonjusticiable cases, regardless of claims of public importance, "because of [the court's] regard for the constitution of this state, which separates the power and functions of the departments of government, Or Const, Art III, § 1, and vests in the courts only 'judicial power.' Or Const, Art VII (Amend), § 1." A few years later, in *Barcik v. Kubiaczyk*, 321 Or 174, 189, 895 P2d 765 (1995), this court reaffirmed the observations that it had made in *Mid-County*.

In summary, *Kay*, *Mid-County*, and *Barcik* indicate, at least in general terms, that the constitutional grant of governmental power to the judiciary is limited by the justiciability requirement. Although the decisions in *Mid-County* and *Barcik* express doubts about this court's constitutional authority to decide moot cases, this court has not undertaken a full constitutional analysis of that subject. This case presents the occasion to do so.

Two constitutional provisions, Article III, section 1, and Article VII (Amended), section 1, of the Oregon Constitution make reference to the judiciary. Article III, section 1, was adopted as part of Oregon's original constitution. That provision states:

> "The powers of the Government shall be divided into three [separate] departments, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."

The phrase "judicial power" appears in Article VII (Amended), section 1, which provides that "[t]he judicial power of the state shall be vested in one supreme court and in such other courts as may from time to time be created by law." Article VII (Amended), section 1, adopted by the people on November 8, 1910, superseded similar text set out in Article VII (Original), section 1, of the Oregon Constitution. That former section provided that "[t]he Judicial power of the State shall be vested in a [Supreme] Court, [Circuit] Courts, and County Courts, which shall be Courts of Record having general jurisdiction, to be defined, limited, and regulated by law in accordance with this Constitution."[2]

The text of Article III, section 1, prompts an initial observation. The scope of judicial power can be defined in two ways: by what it is and by what it is not. The judicial power is

---

[2] Although Article VII (Original) of the Oregon Constitution preceded the present Article VII (Amended) by 61 years, it is the later provision that is the source of this court's power. Thus, our analysis of the concept of "judicial power" focuses, as it must, on the phrase in the 1910 constitutional amendments. However, as we demonstrate below, Article VII (Original) still has a pivotal role to play in interpreting the meaning of its successor.

distinct from the executive power and the legislative power, and it resides in a department separate from the legislative and the executive departments. The judicial department may not exercise any of the functions of one of the other departments, unless the constitution expressly authorizes it to do so. However, standing alone, that constitutional limitation is of little assistance. That is, the concept of separation of powers suggests what judicial power is not, but, without further investigation, it does little to explain what judicial power is.

To make that determination, we must ascertain the intended scope of the "judicial power" described in Article VII (Amended), section 1. That provision does not define judicial power. Instead, Article VII (Amended), section 1, identifies the entities that exercise judicial power, namely, "one supreme court and * * * such other courts as may from time to time be created by law." Article VII (Original) also merely identified the location of judicial power, establishing it in "a [Supreme] Court, [Circuit] Courts, and County Courts[.]" Like Article III, the text of Article VII (Amended), section 1, offers no other textual clues about the scope of the "judicial power." That lack of assistance notwithstanding, the present case requires us to determine the intended meaning of that term.

■■■ When "interpreting a constitutional provision adopted through the initiative petition," the court's "task is to discern the intent of the voters." *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 56, 11 P3d 228 (2000) (citing *Roseburg School Dist. v. City of Roseburg*, 316 Or 374, 378, 851 P2d 595 (1993)). In determining that intent, the "best evidence [ ] is the text of the provision itself[; however, the] context of the language of the ballot measure may also be considered." *Id.* "If the intent of the voters is not clear from the text and context of the initiated constitutional provision, the court turns to the history of the provision." *Id.* (citing *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 559, 871 P2d 106 (1994)).

As noted above, Oregon voters adopted Article VII (Amended) through the initiative process in 1910. In doing so, the phrase "judicial power" was repeated, without modification, from Article VII (Original) in 1910. The term was

left undefined and unchanged, except for removal of the capitalization of the letter "J." In the new provision, the list of entities that would exercise judicial power was changed slightly, but that change does not reveal any particular intent as to the meaning of the phrase, "judicial power." Neither are we aware of any historical evidence that suggests that the voters intended to alter the meaning of the term "judicial power" from the meaning that the term enjoyed in 1857. Given the drafter's decision to carry over the old term into the new amendment, and given the lack of any evidence from any source of which we are aware that, identical phrasing aside, something new and different was intended, we conclude that the voters intended no change to the substantive meaning of the term "judicial power" in their adoption of Article VII (Amended), section 1. *See generally State v. Conger*, 319 Or 484, 491-502, 878 P2d 1089 (1994) (to understand meaning of text set out in Article VII (Amended), section 5, court examined historical background of identical text in Article VII (Original)).

 Because we conclude that the 1910 voters did not intend to change the meaning or scope of "judicial power" in Article VII (Amended), section 1, from what it was understood to include in 1857, we must inquire into the meaning and scope of "judicial power" when Article VII (Original) of the Oregon Constitution was adopted in 1857. When construing original provisions of the Oregon Constitution, this court ascertains and gives effect to the intent of the framers of the provisions at issue. *Stranahan*, 331 Or at 54-55. That intent is determined by (1) analyzing the text and context of the provisions, giving words the same meaning that the framers would have ascribed to them; (2) reviewing the historical circumstances that led to their creation; and (3) examining the case law interpreting those provisions. *Priest v. Pearce*, 314 Or 411, 416, 840 P2d 65 (1992). This court's goal is to apply faithfully the principles embodied in those provisions to modern circumstances. *State v. Rogers*, 330 Or 282, 297, 4 P3d 1261 (2000).

As we observed previously, the meaning of "judicial power" is not clear from the text and context of Article VII (Original), section 1. We therefore turn to the historical circumstances surrounding the creation of that provision. In

doing so, we necessarily, and briefly, address the history of the development of the Oregon judiciary and the judicial power associated with that branch of government.[3]

The creation of an Oregon judiciary is related to the death, on February 15, 1841, of Ewing Young, the "wealthiest American citizen" from the Pacific Northwest territory. Lawrence T. Harris, *A History of the Judiciary of Oregon*, in OREGON SUPREME COURT RECORD 73, 75 (1938). Young had died intestate and had no known heirs. *Id.* Because Young's business had been such an important economic influence on the territory, the territory's inhabitants felt that they needed to devise a system to settle his affairs in an orderly fashion. *Id.* At a meeting involving " 'some of the inhabitants of the Willamette Valley,' " a "provisional government" was formed consisting of "a Governor, a supreme judge with probate powers, three justices of the peace, three constables, and an attorney general." *Id.*

Later, in May 1843, another public meeting was held to institute more formally the provisional government. *Id.* at 76. At that meeting, a legislative committee was formed, and, in July 1843, that committee presented a report intended to be "the first body of rules or regulations which made any approach to laws" of the Oregon Territory. *Id.* The report was adopted by vote of the inhabitants of the territory and vested the judicial power "in a supreme court consisting of a supreme judge and two justices of the peace, [and] a probate court * * *." *Id.* at 76-77.

It was later determined that the original laws required reorganization, and, in July 1845, the inhabitants overwhelmingly adopted a new Organic Law. *Id.* at 79-80. Article I, section 8, provided that "[t]he judicial power shall be vested in a supreme court, and such inferior courts of law, equity and arbitration, as may by law, from time to time be established." Organic Law of the Provisional Government of

---

[3] For a more detailed description of the development of the Oregon judiciary, see Lawrence T. Harris, *A History of the Judiciary of Oregon*, in OREGON SUPREME COURT RECORD 73 (1938); Mirth Tufts Kaplan, *Courts, Counselors and Cases: The Judiciary of Oregon's Provisional Government*, 1961 Or Hist Q 117; Lawrence T. Harris, *History of the Oregon Code* (pts 1 & 2), 1 Or L Rev 129, 1 Or L Rev 184 (1922).

Oregon (reprinted in General Laws of Oregon, p 62 (Deady 1845-64)). The Supreme Court was to consist of "one judge." *Id.* Section 8 provided further that, "whenever called upon by the house of representatives, the supreme judge shall give his opinion, touching the validity of any pending measure."[4] *Id.* The Organic Law, therefore approved of the supreme judge providing advisory opinions to the so-called legislature regarding the validity of proposed measures.

After Congress officially recognized Oregon as a territory of the United States in 1848, An Act to Establish the Territorial Government of Oregon (reprinted in General Laws of Oregon, p 66 (Deady 1845-64)), the citizens of the Oregon Territory voted, in 1857, to allow a group of 60 persons to convene and draft a constitution that would serve as a precursor to a petition for statehood. David Schuman, *The Creation of the Oregon Constitution,* 74 Or L Rev 611, 611-15 (1995). The drafters adapted Article VII (Original), section 1, from Article VII, section 2, of the Wisconsin Constitution. *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857* 475-76 (Charles Henry Carey ed., State Printing Dept, 1926). Article VII (Original) did not include any provision directing the judiciary to provide advisory opinions at the legislature's request. The historical record contains no discussion about the meaning or scope of judicial power or any explanation as to why the authorization for advisory opinions expressed in the Organic Law was not included in the new constitution.[5] *See* Claudia Burton, *A Legislative History of the Oregon Constitution of 1857 — Part II,* 39 Willamette L Rev 245, 253-58, 395-400 (2003) (describing proceedings surrounding the adoption of Article III, section 1, and Article VII (Original), section 1).

---

[4] In 1845, similar wording authorizing or requiring the state's highest court to provide advisory opinions to other governmental branches on important questions of law was included in at least four other state constitutions. *See* Me Const, Art VI, § 3 (1819); Mass Const, Pt II, c III, art II (1780); NH Const, pt II (1784); RI Const, art X, § 3 (1842).

[5] We have not found a pre-1857 Wisconsin case that discussed, in depth, the scope of the judicial power. We have found one case that acknowledged that the powers of the judiciary are separate and distinct from those of the legislative and executive departments of government. *See State ex rel Resley and others v. Farwell, Gov.,* 3 Pin 393 (1852) (so observing).

Because no definitive answer regarding the scope of judicial power has emerged from the constitutional text and historical underpinnings of that text, we turn next to the accepted understanding of the concept of judicial power predating the adoption of the Oregon Constitution in 1857 as reflected in contemporary secondary sources, United States Supreme Court case law, and that of this court. *See generally DeMendoza v. Huffman*, 334 Or 425, 437, 51 P3d 1232 (2002) (examining legal works that were "pervasive in American courts in 1850s"); *Smothers v. Gresham Transfer, Inc.*, 332 Or 83, 94-112, 23 P3d 333 (2001) (examining early commentaries and treatises, colonial history, and case law from other jurisdictions).

Although British courts enjoyed the power to announce advisory opinions, the basis for American concepts of justiciability and judicial power lies not in English precedents, but in the structure of government as set out in the United States Constitution and its description of "the uniquely American relationship between the courts and other branches of government." 13 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3529, 294 (2d ed 1984). Article III, section 1, of the United States Constitution[6] makes reference to the judicial power of federal courts, but without defining the phrase. At the 1787 constitutional convention, James Madison "doubted whether it was not going too far to extend the jurisdiction of the Court generally to cases arising Under the Constitution, & whether it ought not to be limited to cases of a Judiciary Nature." 2 Max Farrand, *The Records of the Federal Convention of 1787* at 430 (1911). He believed that "[t]he right of expounding the Constitution in cases not of this nature ought not to be given to that Department." *Id.* In other words, Madison believed that "expounding the Constitution" should take place only in cases "of a Judiciary Nature." That remark

---

[6] Article III, section 1, of the United States Constitution provides:

"The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office."

suggests that the drafters understood that constitutional exegesis ought to occur only in the context of dispute resolution. We now turn to case law addressing the nature of judicial power.

Early federal case law is more instructive. In 1792, a federal statute provided that disabled Revolutionary War veterans could apply to the federal circuit court for benefits, which would determine veterans' eligibility. *Hayburn's Case*, 2 US 408, 409, 1 L Ed 436 (1792). The Secretary of War then could decide whether to withhold benefits if he suspected that the court had erred in its judgment, and Congress could review the decision of the Secretary of War. In other words, the court's function was to render a nonfinal opinion, subject to executive-branch revision. As a result, some federal courts refused to enforce the act. The Attorney General petitioned the Supreme Court for a writ of mandamus to enforce the law. *Id.* At first, the Attorney General's mandamus petition maintained that its request for relief was "ex officio, without an application from any particular person, but with a view to procure the execution of an act of congress, particularly interesting to a meritorious and unfortunate class of citizens[.]" *Id.* When the court rejected that argument, the Attorney General claimed that he was acting on behalf of Hayburn, a veteran. *Id.* at 409. The court ultimately declined to issue a decision in the case because Congress had changed the procedure for relief, and the case had become moot. *Id.* at 410. Furthermore, in a footnote, the *Hayburn* court related, with apparent approval, letters from three lower courts to President Washington. *Id.* at n 2. The letters rebuffed, on separation-of-powers grounds, the idea that courts could provide the kind of advisory opinion that the statute contemplated. *Id.*

Viewed narrowly, *Hayburn's Case* decided only that the Attorney General could not prosecute the matter *ex officio*. Once Congress enacted new legislation, the court considered the controversy at an end and refused to consider the matter further; it made no direct comment on the subject of advisory opinions. *See generally* Maeva Marcus and Robert Teir, *Hayburn's Case: A Misinterpretation of Precedent*, 1988 Wisc L Rev 527 (discussing procedural posture of case). The presence of the letters, however, has led subsequent courts to

rely on *Hayburn's Case* as counseling against the practice of courts issuing advisory opinions.

In 1852, the United States Supreme Court relied on *Hayburn's Case* in a dispute involving claims arising out of a treaty between the United States and Spain. *United States v. Ferreira*, 54 US 40, 49, 14 L Ed 40 (1852). Congress had enacted legislation providing that the federal court in Florida would evaluate the claims and then forward them to the Secretary of the Treasury for approval and payment. *Id.* at 45. In that instance, the Supreme Court concluded that, where the executive had some discretion in approving the court's judgment, the lower court was not acting pursuant to the judicial power, because it was providing an advisory, nonfinal, opinion.

Another United States Supreme Court case, discussing a dispute over a state's ability to grant railroad construction rights, further illustrates the court's reluctance, during the period just before Oregon statehood, to issue advisory opinions:

> "But on this application for an injunction against the construction of respondents' [rail]road, the chancellor was not bound to decide the question, by anticipation: And, although he may have thrown out some intimation as to his present opinion on that question, he has very properly left it open for future decision, to be settled by a suit at law, or in equity, 'upon the facts of the case as they may then appear.' But however probable as this dispute or contest may be, it is not for this court to anticipate it, and volunteer an opinion in advance."

*Richmond Fredericksburg & Potomac RR Co v. Louisa RR Co*, 54 US 71, 81, 14 L Ed 55 (1851).

Early Oregon cases discussing judicial power are scarce; however, one offers some insight with regard to the question here. *Burnett v. Douglas County*, 4 Or 388 (1873), involved an appeal from a judgment of the circuit court denying a writ of review. *Id.* at 389. The appellants had sought a writ of review to challenge the manner of financing a county road and the court's general order regarding redemption of county-issued warrants. *Id.* The order, however, was not entered in the context of litigation, but was directed to the

county clerk. *Id.* at 390. The court concluded that, in directing the county clerk, the circuit court had not acted in a judicial capacity. *Id.* at 392. In that regard, the court stated that, in an exercise of the judicial power, "proper parties [must appear] before the court, for in all judicial proceedings there must be proper parties who must be, in some way, particularly affected by the judgment, order or determination."[7] *Id.* at 391-92.

■ Some years later, in *David v. Portland Water Committee*, 14 Or 98, 104-05, 12 P 174 (1886), a number of taxpayers challenged the constitutionality of a statutorily authorized committee that had the power to issue bonds. However, at that point, the committee had not levied a tax on the taxpayers. At the end of the opinion, the court expressed doubt that it had the authority to hear the suit, but decided to consider it anyway: "A question has been raised as to the right of the respondents to maintain the suit—as to whether they have any standing in court. My impressions are adverse to the right; but in view of the importance of the case, we have concluded not to consider [the standing issue]." *Id.* at 125. The court offered no justification, constitutional or otherwise, for entertaining a case in which the plaintiffs seemed to lack standing, beyond the fact that the court seemed to believe that the public needed an answer. We deem *David* of little assistance in determining the parameters of judicial power, because it offered no substantial premise for its decision to decide a matter other than its importance. In order to act, courts must exercise "judicial" power; the importance of the issue that the courts are asked to decide, standing alone, does not transform resolution of the issue into an exercise of judicial power.

While the Oregon courts wrestled with the issue, the United States Supreme Court eventually changed its own course and recognized an exception to the federal mootness doctrine that allows for discretionary review of disputes "capable of repetition, yet evading review." *See Southern*

---

[7] Consistent with that observation, we note that, before 1857, other jurisdictions also declined to decide "speculative question[s,]" *Williams v. Cheeseborough*, 4 Conn 356, 1822 WL 42 (Conn 1822), that would have no present practical effect on the rights of the parties, *Pelletreau v. Jackson*, 7 Wend 471 (NY 1831).

*Pacific Terminal Company v. Interstate Commerce Commission*, 219 US 498, 514, 31 S Ct 279, 55 L Ed 310 (1911) (recognizing exception). Since that time, every state, except Oregon, has adopted that exception and has employed the exception from time to time in cases involving alleged harms of a short-term effect—harms that are too ephemeral for courts to adjudicate before factual developments render the disputes involving those harms moot.

The United States Supreme Court itself, however, continues to grapple with the constitutional basis for the non-justiciability of moot disputes, the very concept that led to the creation of the "capable of repetition, yet evading review" exception. In *Honig v. Doe*, 484 US 305, 108 S Ct 592, 98 L Ed 2d 686 (1988), the Court split over both the origin and the parameters of the mootness doctrine. *Honig* involved a claimed violation of the Education of the Handicapped Act (EHA) respecting two students, Doe and Smith. The majority concluded that, although Doe's case was moot because he no longer was eligible for EHA benefits, the case remained justiciable because there was a reasonable likelihood that Smith again would suffer the deprivation of EHA rights that had given rise to the action. As part of that analysis, the majority observed:

> "Under Article III of the Constitution this Court may only adjudicate actual, ongoing controversies. *Nebraska Press Assn. v. Stuart*, 427 US 539, 546, [49 L Ed 2d 683, 96 S Ct 2791] (1976); *Preiser v. Newkirk*, 422 US 395, 401, [45 L Ed 2d 272, 95 S Ct 2330] (1975). That the dispute between the parties was very much alive when suit was filed, or at the time the Court of Appeals rendered its judgment, cannot substitute for the actual case or controversy that an exercise of this Court's jurisdiction requires. *Steffel v. Thompson*, 415 US 452, 459, n 10, [39 L Ed 2d 505, 94 S Ct 1209] (1974); *Row v. Wade*, 410 US 113, 125, [35 L Ed 2d 147, 93 S Ct 705] (1973)."

*Honig*, 484 US at 317-18. Chief Justice Rehnquist, in a separate concurring opinion, disagreed with the majority's comments regarding Article III. The Chief Justice observed that that Court's mootness cases often purported to find their support in Article III of the United States Constitution, yet the Court simultaneously asserted an exception—cases capable

of repetition yet evading review—that was not in that section of the constitution:

> "If it were indeed Art. III which—by reason of its requirement of a case or controversy for the exercise of federal judicial power—underlies the mootness doctrine, the 'capable of repetition, yet evading review' exception relied upon by the Court in this case would be incomprehensible. Article III extends the judicial power of the United States only to cases and controversies; it does not except from this requirement other lawsuits which are 'capable of repetition, yet evading review.' If our mootness doctrine were forced upon us by the case or controversy requirement of Art. III itself, we would have no more power to decide lawsuits which are 'moot' but which also raise questions which are capable of repetition but evading review than we would to decide cases which are 'moot' but raise no such questions."

*Id.* at 330 (Rehnquist, C. J., concurring). The Chief Justice, recognizing the dilemma, suggested that the federal mootness doctrine enjoyed an "attenuated connection" to Article III that could be disregarded if the court deemed it necessary. *Id.* at 331. With regard to the case that established the exception, *Southern Pacific*, Chief Justice Rehnquist remarked that the exception was premised on pragmatic considerations, rather than Article III. *Id.* at 330-31 (Rehnquist, C. J., concurring).

As we already have explained, this court followed *Southern Pacific* and adopted that exception in *Perry*. Like *Southern Pacific*, *Perry* purported to recognize the "capable of repetition, yet evading review" exception. In doing so, however, the *Perry* court simply cited *Southern Pacific*[8] as well as cases from other states, and announced the exception as a convenience to the executive branch of government: "Where

---

[8] The reasoning of *Southern Pacific* is unhelpful because there is no constitutional analysis to support the adoption of such an exception to the mootness doctrine. Rather, in that case, the Court simply determined, in a conclusory fashion, that it needed to engage in a law-announcing function concerning government regulation. In support of that claim, the Court quoted two prior cases for the proposition that important public questions required answers to guide executive conduct without consideration of whether a controversy continued to exist between the parties. *See Southern Pacific*, 219 US at 515-16 (discussing *United States v. Trans-Missouri Freight Ass'n*, 166 US 290, 17 S Ct 540 (1897) and *Boise City Irrigation & Land Co v. Clark*, 131 F 415 (9th cir 1904)) (both so stating).

the question is one involving the public welfare, and there is a likelihood of it being raised again in the future, a court in the exercise of its discretion may decide it for the guidance of an official administrative agency." *Perry*, 180 Or at 498-99. *Perry* thus established an exception to the mootness doctrine without undertaking any effort to determine whether such an exception was compatible with the scope of judicial power granted under the Oregon Constitution.

We cannot assert that the constitutional text and pre-1857 state and federal cases lead to a definitive conclusion regarding the scope of judicial power under the Oregon Constitution. We believe, however, that the prevailing view throughout the American legal landscape in 1857 was that the constitutional grant of judicial power did not include the power to decide cases that had become moot at some stage of the proceedings. As petitioner acknowledges, instances of courts deciding moot cases based on the perceived need to resolve a recurring issue involving the public welfare did not occur until the period between 1895 and 1915. *See, e.g.*, *In re Fairchild*, 151 NY 359, 361, 45 NE 943 (1897) (deciding moot election issue because it "was of sufficient importance to require * * * determination by [that] court"); *In re Madden*, 148 NY 136, 42 NE 534, 535 (1895) (deciding question "of no practical importance in the particular case" because it was likely to recur); *Matter of Cuddeback*, 3 App Div 103, 39 NY Supp 388, 392 (1896) (deciding moot case because it was of "great public interest"). As we have explained, however, the adoption of Article VII (Amended) in 1910 did nothing to change the earlier understanding of judicial power as that phrase appeared in Article VII (Original).

Based on the foregoing, we conclude that the framers of the Oregon Constitution, and those who later adopted that constitution, are most likely to have understood the grant of judicial power in the restrained sense espoused in the early Supreme Court cases—that is, an authority limited to the adjudication of an existing controversy. Because the scope of judicial power that they created is limited in the manner just described, this court did not, in 1857, have the authority to create a rule that exceeded that circumscribed grant of power. Neither did the court acquire such authority in 1910.

■　It follows, we believe, that *Perry* and the cases that relied on *Perry* were wrongly decided. They are overruled. The more recent cases, such as *Barcik*, are correct. The judicial power under the Oregon Constitution does not extend to moot cases that are "capable of repetition, yet evading review."

■　Petitioner has requested this court to decide a matter that no longer is a controversy between the parties. As we have explained, Article VII (Amended), section 1, of the Oregon Constitution constrains us from doing so. The circuit court therefore must vacate its judgment and dismiss petitioner's writ of review as moot.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is vacated.

**BALMER, J.,** specially concurring.

This case never presented a justiciable controversy because petitioner's 30-day exclusion order had expired before he filed his petition for review in circuit court. For that reason, I agree with the majority that the circuit court judgment should be vacated and that the petition filed in the circuit court should be dismissed as moot.[1] The majority, however, like the parties, has framed and decided a different and important issue: "whether Oregon courts have the power to consider disputes that, like the present one, are capable of repetition and yet evade review because they become moot at some point in the proceedings." 337 Or at 347. I write separately, because I disagree with the majority's view that Oregon courts have no power to consider such disputes.

---

[1] One might argue that, given my view that courts may decide some moot cases, I also should find that the trial court had jurisdiction over this case because the relevant event (the duration of petitioner's 30-day exclusion order) was so short that petitioner could not challenge the order in an administrative hearing, obtain a result, and file his petition for judicial review before the order had expired. Whatever the strengths or weaknesses of that position, it was not addressed by the trial court, the Court of Appeals, or the majority opinion in this court. Rather, the trial court addressed the merits of petitioner's constitutional challenge to the exclusion ordinance, and the Court of Appeals and the majority opinion in this court focus on whether the judicial power extends to deciding a case that becomes moot after it has been filed in the trial court. I limit my discussion to that issue.

The majority holds that "[t]he judicial power of the state," as that phrase is used in Article VII (Amended), section 1, of the Oregon Constitution, does not extend to a case that becomes moot after filing because the events involved are of such short duration. Unlike the majority, I find nothing in the text, context, or historical background of that constitutional provision to suggest that a case that presents a dispute that is subject to the "judicial power" when it is filed somehow moves beyond that power simply because the events involved are so brief that they inevitably conclude before the courts can render a final decision. On the contrary, along with the federal courts and the courts of the other 49 states, I would recognize an exception to the general mootness doctrine for that small group of cases that are capable of repetition but evade judicial review because the events involved are of such brief duration.[2]

The majority properly begins its analysis by attempting to determine whether that exception fits within the Oregon Constitution's grant of judicial power. Countless appellate opinions have considered what the judicial power entails, and the precise scope of that power cannot be delineated in the abstract.[3] This court, like the federal courts and other state courts, interprets the constitutional grant of the judicial power to authorize courts to decide only cases that present a "justiciable controversy." *Cummings Constr. v. School Dist. No. 9*, 242 Or 106, 109-10, 408 P2d 80 (1965).[4]

---

[2] A list of decisions from the other 49 states, each recognizing a "capable of repetition, yet evading review" exception to mootness is set out in the Appendix. While those decisions provide limited guidance for our interpretation of the Oregon Constitution, to the extent that the doctrine rests, at least in part, on prudential considerations, as I argue below, they suggest that virtually every other court that has considered the doctrine finds it useful. Moreover, other state constitutions use the same phrase that appears in the Oregon Constitution—the "judicial power"—to describe the scope of the judiciary's authority. The majority's interpretation of that term to mean something different than it means to every other court in this country suggests that the majority has the less persuasive argument, as I assert in the text.

[3] See, for example, the diverse opinions (and the cases and commentators on which they rely) in the Court of Appeals decision in *Utsey v. Coos County*, 176 Or App 524, 529-47, 32 P3d 933 (2002), *rev dismissed*, 335 Or 217 (2003); 176 Or App at 562-72 (Deits, C. J., dissenting); *id.* at 574-85 (Armstrong, J., dissenting); *id.* at 588-95 (Brewer, J., dissenting).

[4] This court's cases discussing the origins and scope of the justiciability requirement have not always been consistent, however. *See Utsey*, 176 Or App at 537-38 (discussing justiciability case law).

Whether a case is "justiciable" depends on whether "the interests of the parties to the action are adverse" and whether "the court's decision in the matter will have some practical effect on the rights of the parties." *Brumnett v. PSRB*, 315 Or 402, 405, 848 P2d 1194 (1991). Mootness is one application of the latter principle: "Cases that are otherwise justiciable, but in which a court's decision no longer will have a practical effect on or concerning the rights of the parties, will be dismissed as moot." *Id.* at 406.

Those attributes of "justiciability" are part of an interpretive effort by this court to identify the boundaries of the "judicial power," and I do not disagree with them. The constitutional test, however, is whether the resolution of a particular case is within the "judicial power"; the attributes of a justiciable controversy are simply devices to help courts interpret and apply the constitutional text. Viewed from that perspective, the mootness doctrine, although rooted in the constitutional authorization that the courts exercise "judicial power," includes an important prudential component. For reasons that I explain below, in my view, when strict application of the mootness doctrine would have the effect of preventing judicial review of an issue of law because the issue is one that is capable of repetition, yet evades review, the court may exercise its discretion to decide an otherwise justiciable case that has become moot.[5] Nothing in the text of Article VII (Amended) compels the conclusion that such a case is outside the judicial power, and such a case retains sufficient traditional attributes of justiciability that a court is not constitutionally barred from deciding it.

Decades of this court's decisions support the conclusion stated above. During the 50-year history of the "capable

---

[5] In that regard, I agree with the conclusion Chief Justice Rehnquist reached after reviewing the federal mootness cases:

"The logical conclusion to be drawn from these cases, and from the historical development of the principle of mootness, is that while an unwillingness to decide moot cases may be connected to the case or controversy requirement of Art. III, it is an attenuated connection that may be overridden where there are strong reasons to override it. The 'capable of repetition, yet evading review' exception is an example."

*Honig v. Doe*, 484 US 305, 331, 108 S Ct 592, 98 L Ed 2d 686 (1988) (Rehnquist, C. J., concurring).

of repetition, yet evading review" exception in Oregon, the exception has been viewed as a pragmatic, prudential response to the adverse consequences of a strict application of the mootness doctrine. Half a century ago, this court stated its rule with admirable clarity:

> "We agree that courts ordinarily do not determine moot questions. There is, however, a well recognized exception to this general rule. Where the question is one involving the public welfare, and there is a likelihood of it being raised again in the future, a court in the exercise of its discretion may decide it for the guidance of an official administrative agency."

*Perry v. Oregon Liquor Commission*, 180 Or 495, 498-99, 177 P2d 406 (1947). The majority argues that the reference in *Perry* to deciding the case "for the guidance of an official administrative agency" suggests that the court viewed the case as involving an advisory opinion. 337 Or at 349-50. However, the dispute in *Perry* came to the courts as a justiciable case, it was litigated between two adverse parties, the same issue was likely to be raised in the future, and this court correctly saw the benefit of rendering a decision on the merits. In the 40 years after *Perry*, this court on at least five occasions, and the Court of Appeals on at least two additional occasions, decided cases that were technically moot, but that came within the "capable of repetition, yet evading review" exception.[6] In each of those cases, the appellate courts decided important legal questions that otherwise would have remained unresolved. In my view, those decisions involved the proper exercise of the judicial power. I would overrule this court's decision in *Barcik v. Kubiaczyk*, 321 Or 174, 188, 895 P2d 765 (1995), which, building on statements in several earlier cases, expressly repudiated the "capable of repetition, but evading review" exception.

---

[6] In addition to *Perry*, this court decided technically moot cases in *State ex rel. v. Newbry et al.*, 196 Or 331, 337, 248 P2d 840 (1952); *State ex rel. v. Smith et al.*, 197 Or 96, 126, 252 P2d 550 (1953); *Huffman v. Alexander*, 197 Or 283, 290, 253 P2d 289 (1953); *Linklater v. Nyberg*, 234 Or 117, 120, 380 P2d 631 (1963); and *Stowe v. School District No. 8-C*, 240 Or 526, 528, 402 P2d 740 (1965). The Court of Appeals issued decisions on the merits in similar circumstances in *Whipple v. OSAA*, 52 Or App 419, 422, 629 P2d 384, *rev den*, 291 Or 504 (1981), and *OSAA v. Stout*, 71 Or App 405, 407, 692 P2d 633 (1984).

The majority is certainly correct that the mootness doctrine, and the exceptions to it, are closely related to the "judicial power" as that term is used in Article VII (Amended), section 1. However, this court consistently has viewed the contours of mootness as a prudential, rather than a constitutional, matter. *See Oregon State Grange v. McKay*, 193 Or 627, 631, 238 P2d 778 (1951), *on reh'g*, 239 P2d 834 (1952) ("We, of course, recognize that courts will, in the exercise of discretion, decide moot questions when the conditions referred to in the *Perry* case are present."). With this decision, the majority bases the mootness doctrine entirely on its interpretation of the Oregon Constitution and concludes that the limits of the "judicial power" bar this court from ever considering a case that has become moot.

In my view, however, nothing in the Oregon Constitution prohibits this court from deciding a case that becomes moot during the pendency of the case, when the case involves issues that are capable of repetition, yet evade review. First I consider the authorities on which the majority relies in interpreting Article VII (Amended), section 1, and then I turn to this case and the reasons why I read the phrase "the judicial power" more broadly than the majority does.

The majority relies on federal cases decided before 1857 in its effort to establish that "the framers of the Oregon Constitution, and those who later adopted that constitution, are most likely to have understood the grant of judicial power in the restrained sense espoused in the early Supreme Court cases—that is, an authority limited to the adjudication of an existing controversy." 337 Or at 362. With respect, the majority's analysis is unpersuasive. The cases on which the majority relies all stand for general propositions regarding the scope of the judicial power that are not in dispute here. As the majority acknowledges, the United States Supreme Court refused to render a decision in *Hayburn's Case*, 2 US 408, 1 L Ed 436 (1792), because Congress adopted a new statute. *See* 337 Or at 358(so noting). Thus, the issue in that case was not going to arise again.[7] The court reporter in

---

[7] Similarly, the Portland ordinance at issue here has been amended in a way that appears to permit an exclusion order to be appealed without the dispute becoming moot. *See* 337 Or at 347-48 (describing amendment to ordinance). If so,

*Hayburn's Case* included in a footnote the opinions of several members of the Court, sitting as circuit judges. *Id.* at 410 n *. Those judges had expressed the view that the judicial power and related separation of powers concepts did not permit the courts to determine eligibility for veterans' benefits when that determination was subject to later review by the Secretary of War and by Congress. Such a determination would be merely advisory because it would be subject to review by another branch of government.

The majority also cites *United States v. Ferreira*, 54 US 40, 14 L Ed 40 (1851), in which a similar statute directing federal courts to evaluate war-related claims was subject to further review by the Secretary of the Treasury. *Ferreira* thus also concerned a situation in which a court was asked to render an opinion that was "advisory" because it could be revised by another branch of government.The debates at the Constitutional Convention and in the early years of the republic also make it clear that the federal judicial power never has included the authority to "provid[e] purely advisory opinions to the Executive * * *." *Clinton v. Jones*, 520 US 681, 700, 117 S Ct 1636, 137 L Ed 2d 945 (1997); *see* Laurence H. Tribe, *American Constitutional Law* 328-30 (3d ed 2000) (describing basis and scope of doctrine). The authorities that the majority cites simply demonstrate that the federal judicial power does not authorize the judicial branch to provide "purely advisory opinions" outside the context of an actual dispute.[8] Neither does the federal judicial power permit the courts to operate as administrative subordinates of the other branches by making determinations that do not result in final judgments. I agree with the majority that those principles articulated in the early federal cases inform our understanding of "[t]he judicial power," as that phrase is used in the Oregon Constitution.

---

this case would not come within the "capable of repetition, yet evading review" exception to mootness, even if this court were to hold that such an exception exists.

[8] This court consistently has recognized a clear distinction between "advisory" opinions, which are not authorized in Oregon, and proceedings in which a party seeks a judgment in court. The latter proceedings, including this case, seek to invoke the "judicial power" and will be decided by the courts if they meet the attributes of justiciability discussed in the text. *See Oregon Medical Association v. Rawls*, 281 Or 293, 301-02, 574 P2d 1103 (1978) (distinguishing between advisory opinions and proceedings that seek court judgments but are nonjusticiable).

This case, however, is not about "purely advisory opinions" or court determinations subject to review by other branches of government. None of the pre-1857 cases that the majority discusses addressed whether the federal judicial power prevents a court from deciding a case that (1) was justiciable at the time that the parties initiated it, but (2) became moot during the litigation, and (3) involved events that were likely to recur, but were of such short duration that they typically evade judicial review.

The majority declines to rely on cases from other jurisdictions decided *after* 1857. Instead, the majority asserts that post-1857 cases are irrelevant to understanding what the framers of the Oregon Constitution intended to include within the "judicial power" because, when that term was used in Article VII (Amended) (adopted in 1910), it was intended to have the same meaning as the term had in Article VII (Original) (drafted in 1857). 337 Or at 362. I disagree.

First, the majority notes that the drafters of Article VII (Amended) indicated no intent to change the meaning of "judicial power" from Article VII (Original). However, that does not mean that the drafters necessarily intended to *preclude* the exercise of the judicial power in the cases at issue here. The drafters also indicated no intent to set Oregon *apart* from other jurisdictions that, by 1910, viewed the judicial power as extending to those cases that had become moot by the passage of time, but presented legal issues likely to recur. As the majority recognizes, the New York courts had determined by the late 1800s that they properly could decide election law cases involving issues that were likely to arise again, even though the particular election had occurred and had rendered the case moot. *In re Madden*, 148 NY 136, 139, 423 NE 534 (1895) (deciding dispute over form of ballot after election, because issue was likely to recur). Similarly, in *Boise City Irrig. & Land Co. v. Clark*, 131 F 415, 419 (9th 1904), the court adjudicated a challenge to irrigation rates even though the effective period of the disputed rate had ended during the litigation. The court noted that "the courts have entertained and decided [moot] cases heretofore * * * partly because of the necessity or propriety of deciding some question of law presented which might serve to guide the

municipal body when again called upon to act in the matter."
131 F at 419.

It is at least as reasonable as the majority's position
to suggest that the voters who adopted Article VII (Amended)
intended the phrase "judicial power" to have the same mean-
ing that it had in 1857 *and* that that meaning would be the
one that, by 1910, many state and federal courts recognized
as containing from inception the authority that is in question
here. As the above cases indicate, by 1910, state and federal
courts did not think that the "judicial power" limited their
authority to decide moot cases that raised issues capable of
repetition, yet evading review.

Second, federal cases arising after 1857 provide
some guidance in determining the scope of the judicial power
under the Oregon Constitution, because they involve the sim-
ilar judicial power exercised by the federal courts under Arti-
cle III of the United States Constitution. Those cases, more-
over, address the precise issue involved here. The majority
relies on early federal cases that present undeniably different
factual and legal scenarios than this case, but rejects later
federal cases that are directly on point. The leading federal
case, of course, is *Southern Pacific Terminal Co. v. ICC*,
219 US 498, 31 S Ct 279, 55 L Ed 310 (1911), in which the
United States Supreme Court addressed the issue raised
here and held that it could decide a moot case involving a dis-
pute that was capable of repetition, yet evaded review.[9] Sig-
nificantly, the Court saw no need to discuss or overrule deci-
sions such as *Hayburn's Case* and *Ferriera*, indicating that it
perceived no conflict between those earlier decisions and its
holding in *Southern Pacific*. In other words, although
*Southern Pacific* and the many decisions that follow it came
long after the Oregon Constitution was written, there is no

---

[9] The majority opinion essentially dismisses *Southern Pacific* as a "conclusory"
exercise of the Court's law-announcing function. 337 Or at 361 n 8 . In my view, the
Court correctly observed that, if it adhered to its usual rule regarding moot cases,
legal challenges to Interstate Commerce Commission actions could be "defeated, by
short term orders, capable of repetition, yet evading review, and at one time the
government, and at another time the carriers, have their rights determined by the
Commission without a chance of redress." *Southern Pacific*, 219 US at 515. The
Court properly saw that its law-determining role required it to decide the case even
though it had become moot.

reason to think that they represented a uniquely post-1857 view of the kinds of cases that federal courts could decide.

Not a single one of the decisions cited by the majority, whether from Oregon, the federal courts, or other state courts, stands for the proposition that a justiciable case that becomes moot by the passage of time, but presents a controversy likely to recur, is beyond the "judicial power"—until this court's decisions beginning in the late 1980s. As stated above, I would overrule those later cases.

With those considerations in mind, I return to this case. This case presents a traditional dispute between two parties, litigated through established judicial processes. In this dispute, however, the challenged governmental action lasted only 30 days and therefore ended before petitioner's constitutional challenge could be adjudicated. Thus, the majority is correct that a ruling from this court (or from the trial court, for that matter) will have no effect on *the particular exclusion* that was the basis for petitioner's challenge. As discussed above, however, that is not the same as saying that a judicial ruling would be simply "advisory." On the contrary, two adverse parties are before the court, presenting opposing arguments on the merits of the case; a ruling on the merits would establish whether the city's ordinance is constitutional or not and, thus, would have a direct, immediate effect on the city; and a ruling on the merits would have an indirect effect on persons who may be issued exclusion orders in the future. Finally—and critically—any other person in petitioner's position would face the same, insurmountable hurdle that the majority places in front of his challenge to the exclusion order: In every case, the order will expire before judicial review of any challenge can be completed, and, in every case, the challenge then will be dismissed as moot.[10]

Petitioner's dilemma is not unique. There are other cases in which the brief nature of the challenged action or the

---

[10] I note that, earlier this year, the Portland City Council amended the ordinance involved here to stay the effectiveness of an exclusion order if the order is appealed. *See* 337 Or at 347-48 n 1 (quoting amendment to ordinance). I agree that, if the effectiveness of an exclusion order—or any similar order that is challenged in court—is stayed while the challenge to the order is litigated, then the case does not become moot and there is no occasion to resort to the "capable of repetition, yet evading review" exception to the mootness doctrine.

expiration of short and immovable deadlines renders otherwise justiciable cases moot, not because the defendant has changed its policy or the plaintiff has abandoned its challenge, but simply by the passage of time. Moreover, in any subsequent case raising the same issue, the passage of time again will cause the issue to become moot.[11] In those cases, a court is presented with a controversy that is plainly within "the judicial power" at the time that it is filed but that becomes moot during the ordinary conduct of the litigation. The majority's decision that Oregon courts are barred by the Oregon Constitution from deciding such cases significantly diminishes the "judicial power" of Oregon courts and ensures that important issues of regulatory authority and constitutional law will remain undecided.

In my view, the "judicial power" of the Oregon courts is not so limited. Since *Marbury v. Madison*, 5 US 137, 2 L Ed 60 (1803), state and federal courts have agreed with Chief Justice Marshall: "It is emphatically the province and duty of the judicial department to say what the law is." *Id.* at 177. Courts "say what the law is" in the course of deciding contested court cases. Consistently with that judicial power and with separation of powers requirements, the Oregon courts long have deemed it to be their province, rather than that of the legislature or the executive, finally to determine the meaning of constitutional provisions, statutory and regulatory enactments, and the common law.[12] Within the structure of the Oregon judiciary, this court has the last word, and only

---

[11] Similar mootness issues arise when a person challenges a short-term administrative agency order that then expires, *see, e.g., Perry*, 180 Or at 495 (liquor commission order expired after 60 days); a student claims that a sectarian prayer at a school graduation is unconstitutional, and the graduation ceremony is held while the case is pending, *Kay v. David Douglas Sch. Dist. No. 40*, 303 Or 574, 738 P2d 1389 (1987), *cert den*, 484 US 1032 (1988); or when a political party challenges the state's interpretation of an election statute, but the case cannot be finally resolved before the election. *E.g., Oregon Republican Party v. State of Oregon*, 301 Or 437, 722 P2d 1237 (1986) (dismissing as moot party's challenge to state determination that plan to encourage absentee voting by providing stamped envelopes to voters, along with absentee ballot request forms, was unlawful).

[12] *See, e.g., Automobile Club v. State of Oregon*, 314 Or 479, 487, 840 P2d 674 (1992) ("We hold that the underground storage tank assessment is a 'tax' under Article IX, section 3a(1)(a), and that, *no matter what label the legislature may attach to a tax on motor vehicle fuel*, whether it be 'fee,' 'excise,' 'tithe,' 'assessment,' or some other term, the revenues derived therefrom must be dedicated to the listed purposes." (Emphasis added.)).

this court can "describe the law of this state authoritatively." *Jones v. General Motors Corp.*, 325 Or 404, 416, 939 P2d 608 (1997). For the Oregon courts to fulfill that role—and not leave private parties and governmental entities to guess as to whether particular actions are consistent with law—the "judicial power" should be interpreted to allow the courts, in appropriate circumstances, to review cases that become moot during appeal because they involve events of such brief duration.

Chief Justice Rehnquist reasoned in *Honig v. Doe*, 484 US 305, 331, 108 S Ct 592, 98 L Ed 2d 686 (1988) (Rehnquist, C. J., concurring), that the "capable of repetition, yet evading review" exception to mootness was a prudential method to avoid "squander[ing of judicial resources] after the decisional process is underway." *Id.* at 332 (Rehnquist, C. J., concurring). Another authority similarly describes the reasons that a "capable of repetition, yet evading review" exception to mootness does not undermine the reasons for the justiciability requirement:

> "(i) an actual course of conduct, even if past, continues to frame litigation in a factual context and thereby focus[es] judicial decisionmaking; (ii) the unlawful causation of a past injury deprives a defendant of any moral entitlement to freedom from judicial intervention; (iii) sharp, adversarial presentation of issues may occur despite the mooting of a plaintiff's personal stake in the outcome; (iv) since a defendant who has caused wrongful conduct would otherwise remain free to repeat it, a judicial decision forbidding such conduct is not an advisory opinion in any objectionable sense; and (v) judicial investment in the resolution of an issue of public importance should not be squandered."

Richard H. Fallon, David L. Shapiro, and Daniel J. Meltzer, *Hart & Wechsler's The Federal Courts and the Federal System* § 4, 219 (4th ed 1996); *see also* Tribe at 347-50 (describing basis for "capable of repetition, yet evading review" exception to mootness).

That position is consistent with Article VII (Amended), section 1, Article VII (Original), section 1, and Article III, section 1, of the Oregon Constitution and with decades of cases decided by this court. Nothing in the text of any of those constitutional provisions compels the conclusion

that this court is powerless to decide a case that was justiciable when filed, but was destined to became moot by the mere passage of 30 days. The constitutional grant of the "judicial power" to the Oregon courts should not be so narrowly construed.[13]

For the foregoing reasons, although I agree with the majority's disposition of this case, I disagree with its conclusion that the judicial power of Article VII (Amended), section 1, of the Oregon Constitution does not extend to cases that become moot during the litigation process, but involve issues that are capable of repetition, yet evade review.

Riggs, J., joins in this specially concurring opinion.

---

[13] I do not argue, however, that the courts should decide every case that becomes moot because it involves events of short duration. The mootness doctrine has important constitutional roots, even though, as I have argued above, its contours and exceptions are in part prudential. In many cases, it will be appropriate for a court to dismiss a case that has become moot after it has been filed, notwithstanding that the issue is one capable of repetition, yet evading review. And the fact that a case has or may become moot by the expiration of an order, the passing of a deadline, or a party's change in age or status, may well be relevant in this court's consideration of whether it should allow or deny a petition for review. *See* ORAP 9.07 (including, among criteria for granting discretionary review, whether issue arises often and whether consequences of decision are important to the public). I also recognize that different courts have disagreed as to whether the "repetition" of the circumstances must involve the same party and as to the degree of likelihood that the circumstances will recur. Tribe at 349. If this court were to adopt the position that I advocate, then those issues would be addressed in the context of specific cases; there is no occasion to consider the precise outlines of the exception in this opinion.

# APPENDIX

Alabama: *Griggs v. Bennett*, 710 So 2d 411, 412 n 4 (Ala 1998) (recognizing the "capable of repetition, yet evading review" exception to the mootness doctrine).

Alaska: *State Dep't of Revenue, CCESD v. A.H.*, 880 P2d 1048, 1049 (Alaska 1994) (recognizing the "public interest" exception to the mootness doctrine, which requires that an issue be (1) capable of repetition, (2) capable of evading review, and (3) of considerable public interest).

Arizona: *Sherrill v. Dep't of Transp.*, 165 Ariz 495, 497, 799 P2d 836, 838 (1990) ("We will consider cases that have become moot when significant questions of public importance are presented and are likely to recur.").

Arkansas: *Wilson v. Pulaski Ass'n of Classroom Teachers*, 330 Ark 298, 301, 954 SW2d 221, 223 (1997) ("An exception to the mootness doctrine, however, allows review for appeals involving the public interest and the prevention of future litigation.").

California: *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court*, 20 Cal 4th 1178, 1190 n 6, 980 P2d 337, 346 n 6 (1999) ("[A]s scores of other reviewing courts in this same posture have concluded, we determine that although the present case is technically moot, it presents an important question affecting the public interest that is 'capable of repetition, yet evading review.' ").

Colorado: *Humphrey v. Southwestern Dev. Co.*, 734 P2d 637, 639 (Colo 1987) (recognizing two exceptions to the mootness doctrine: one for matters "capable of repetition, yet evading review," and the other if "the matter involves a question of great public importance or an allegedly recurring constitutional violation").

Connecticut: *Loisel v. Rowe*, 233 Conn 370, 378-86, 660 A2d 323, 328-32 (1995) (including a lengthy discussion of the elements and theory of the doctrine of "capable of repetition, yet evading review").

Delaware: *Darby v. New Castle Gunning Bedford Ed. Ass'n*, 336 A2d 209, 209 n 1 (Del 1975) ("[I]n view of the substantial public interest in the statute, we consider the merits of the appeal under the well-established public-interest-exception-to-the-mootness doctrine.").

Florida: *N.W. v. State*, 767 So 2d 446, 447 n 2 (Fla 2000) ("[B]ecause periods of supervision or community control may expire before a case may be reviewed, this case presents a controversy capable of repetition, yet evading review, which should be considered on its merits."); *Ervin v. Capital Weekly Post*, 97 So 2d 464, 466 (Fla 1957) ("We reiterate that an appellate court does not lose jurisdiction of a cause even though the matter in controversy has become moot as to one or more of the litigants in cases involving wide public interest or where such matters involve the duties and authority of public officials in the administration of the law and are of general interest to the people. The future administration of the election law by public officials requires the hearing of the merits of the appeal."); *Sterling v. Brevard County*, 776 So 2d 281, 285 (Fla Dist Ct App 2000) ("[C]ourts are always free to address the merits of an action which has been deemed moot if the action is capable of repetition yet evading review and presents an important issue.").

Georgia: *Collins v. Lombard Corp.*, 270 Ga 120, 121-22, 508 SE2d 653, 655 (1998) ("[T]he term 'moot' must be narrowly construed to exclude from mootness those matters in which there is intrinsically insufficient time to obtain judicial relief for a claim common to an existing class of sufferers. Since there would always be, in such cases, a live controversy, albeit no longer between the named parties, jurisdiction would not be foreclosed by the prohibition against advisory opinions." (Citation omitted.)).

Hawaii: *Johnston v. Ing*, 50 Haw 379, 381, 441 P2d 138, 140 (1968) ("When the question involved affects the public interest, and it is likely in the nature of things that similar questions arising in the future would likewise

become moot before a needed authoritative determination by an appellate court can be made, the exception is invoked.").

Idaho: *Selkirk Seed Co. v. Forney*, 134 Idaho 98, 101, 996 P2d 798, 801 (2000) (stating that courts have the discretion to decide cases that are in the public interest and are "susceptible to repetition yet evading review").

Illinois: *In re Barbara H.*, 183 Ill 2d 482, 490, 702 NE2d 555, 559 (1998) (recognizing exception to the mootness doctrine when the complaining party demonstrates that: "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again"); *In re a Minor*, 127 Ill 2d 247, 257-58, 537 NE2d 292, 296 (1989) (recognizing exception to the mootness doctrine for both questions of great public interest and issues that are "capable of repetition, yet evading review").

Indiana: *In re Lawrance*, 579 NE2d 32, 37 (Ind 1991) (stating that the Indiana Constitution lacks a "cases and controversies" requirement, thus opening the door for courts to decide questions of "great public interest" that are likely to recur).

Iowa: *Polk County Sheriff v. Iowa Dist. Court*, 594 NW2d 421, 425 (Iowa 1999) (recognizing exception to the mootness doctrine for cases that affect public policy and that "may arise repeatedly, yet evade appellate review").

Kansas: *Shirley v. Retail Store Employees Union*, 225 Kan 470, 472, 592 P2d 433, 434-35 (1979) (recognizing exception to mootness doctrine for cases that are "capable of repetition, yet evading review," and that are "of public importance").

Kentucky: *May v. Coleman*, 945 SW2d 426, 427 (Ky 1997) ("However, the general rule does not apply in a situation in which litigation is likely to be repeated * * * or where the issue is 'capable of repetition, yet evading review.'" (Citations omitted.)).

Louisiana: *State v. Taylor*, 769 So 2d 535, 537 (La 2000) ("Should we decline the issue because it is now moot, the issue could permanently escape our consideration and evade appellate review because that window of time for review is shorter than the ordinary appellate delay.").

Maine: *Fredette v. Sec'y of State*, 1997 Me 105, 4, 693 A2d 1146, 1147 (1997) ("Because the issue raised by Fredette is capable of repetition and will evade review if we do not address the merits of his appeal, we decline to dismiss the appeal as moot.").

Maryland: *State v. Parker*, 334 Md 576, 584-85, 640 A2d 1104, 1108 (1994) ("[E]ven if no controversy exists at the precise moment of review, a case will not be deemed moot if the controversy between the parties is 'capable of repetition, yet evading review.' ").

Massachusetts: *Karchmar v. Worcester*, 364 Mass 124, 136, 301 NE2d 570, 578 (1973) (recognizing the "capable of repetition, yet evading review" exception to the mootness doctrine when an issue is of public importance and when the duration of the issue makes declaratory relief very difficult).

Michigan: *Franciosi v. Michigan Parole Bd.*, 461 Mich 347, 348, 604 NW2d 675, 675 (2000) ("[W]e issue this opinion because the issue is capable of repetition while evading our review * * *.").

Minnesota: *In re Schmidt*, 443 NW2d 824, 826 (Minn 1989) ("Notwithstanding this aversion to consideration of moot questions, appellate courts have carved out an exception provided the issue is 'capable of repetition yet evading review.' * * * When deemed appropriate, this court has applied the exception.").

Mississippi: *Hemphill Constr. Co. v. City of Laurel*, 760 So 2d 720, 724 (Miss 2000) ("While the issue before us may be academic insofar as it affects these parties at this time, the situation here presented is capable of repetition. Parties such as Hemphill might again be unable to have meaningful review of their claims. The issue,

therefore, is not moot."); *Ex parte Jones County Grand Jury*, 705 So 2d 1308, 1313-14 (Miss 1997) ("However, the doctrine which prevents adjudication of moot cases provides an exception for those cases which are capable of repetition yet evading review." (Citation omitted.)).

Missouri: *In re 1983 Budget for Circuit Court*, 665 SW2d 943, 943 n 1 (Mo 1984) ("[W]e decline to dismiss the case as moot since it presents an important question 'capable of repetition, yet evading review.' ").

Montana: *J.M. v. Montana High Sch. Ass'n*, 265 Mont 230, 241, 875 P2d 1026, 1033 (1994) ("[W]e also note that given the amount of time inherent in the litigation process, and given our reluctance to entertain original proceedings and special writs except under extraordinary circumstances, it would be nearly impossible for any case such as this to ever reach this Court, via the usual litigation/appeal process, within the time during which the injunction was in effect. To mechanically apply the doctrine of mootness under such circumstances would effectively deny the remedy of appeal.").

Nebraska: *State v. Dawn*, 246 Neb 384, 391, 519 NW2d 249, 255 (1994) ("Because this situation affects the public interest and is capable of repetition, yet evading review, we now resolve that question.").

Nevada: *Del Papa v. Bd. of Regents*, 114 Nev 388, 401, 956 P2d 770, 779 (1998) ("Although the Board chose not to issue the release, our decision on the merits of this appeal is not moot because the issue resolved is 'capable of repetition yet evading review.' ").

New Hampshire: *Asmussen v. Comm'r, N.H. Dep't of Safety*, 145 NH 578, 591, 766 A2d 687, 691 (NH 2000) (recognizing "capable of repetition, yet evading review" exception to mootness doctrine).

New Jersey: *N.J. Div. of Youth & Family Servs. v. J.B.*, 120 NJ 112, 119, 576 A2d 261, 264 (2001) (stating that court would hear the case because issue was of "considerable public importance" and was "capable of repetition, yet evading review").

New Mexico: *Pinell v. Bd. of County Comm'rs*, 127 NM 452, 456, 982 P2d 503, 507 (1999) (recognizing exception to mootness doctrine when issue is of "substantial public interest" and is "capable of repetition, yet evading review" (citation omitted)).

New York: *People ex rel. Maxian v. Brown*, 77 NY2d 422, 425, 570 NE2d 223, 224 (1991) (recognizing exception to mootness doctrine when issue is "capable of repetition, yet evading review").

North Carolina: *Simeon v. Hardin*, 339 NC 358, 370, 451 SE2d 858, 867 (1994) (court has a "duty" to address an otherwise moot case when the "question involved is a matter of public interest").

North Dakota: *In re E.T.*, 2000 ND 174, P5, 617 NW2d 470, 471 (2000) ("[I]ssues characterized as moot will nonetheless be heard by this court if the controversy is capable of repetition, yet evading review, or if the controversy is one of great public interest and involves the power and authority of public officials.").

Ohio: *State ex rel. Dispatch Printing Co. v. Louden*, 91 Ohio St 3d 61, 64, 741 NE2d 517, 521 (2001) (recognizing the "capable of repetition, yet evading review" exception to the mootness doctrine when "the challenged action is too short in duration to be fully litigated before its cessation or expiration, and there is a reasonable expectation that the same complaining party will be subject to the same action again").

Oklahoma: *Federal Land Bank v. Story*, 756 P2d 588, 589 (Okla 1988) ("[M]ootness will not act as a bar when the challenged event is 'capable of repetition, yet evading review.' ").

Pennsylvania: *In re Hasay*, 546 Pa 481, 491, 686 A2d 809, 814 (1996) ("[T]his matter is technically moot. It is nonetheless justiciable as an exception to the mootness doctrine because it is clearly 'capable of repetition, yet evading review.' ").

Rhode Island: *Blais v. Blais*, 652 A2d 963, 964 (RI 1995) ("Although the question before us is moot * * *, we believe it is a matter of public importance. It is a matter capable of repetition, which may evade review.").

South Carolina: *Charleston County Sch. Dist. v. Charleston County Election Comm'n*, 336 SC 174, 180, 519 SE2d 567, 570-71 (1999) ("A court may take jurisdiction, despite mootness, if the issue raised is 'capable of repetition but evading review.' " (Citation omitted.)).

South Dakota: *Rapid City Journal v. Circuit Ct.*, 283 NW2d 563, 565-66 (SD 1979) ("A well-recognized exception to the general rule, however, is that jurisdiction will lie even though the order attacked has expired if the underlying dispute between the parties is one 'capable of repetition, yet evading review.' ").

Tennessee: *State v. Drake*, 701 SW2d 604, 609 (Tenn 1985) (recognizing exception to mootness doctrine in the context of a motion for closure or restrictive order because the issue is "capable of repetition yet evading review").

Texas: *Tex. Dep't of Pub. Safety v. LaFleur*, 32 SW3d 911, 913-14 (Tex App 2000) (recognizing exception to the mootness doctrine when issue is of "considerable public interest" or when "future parties could find themselves in the same position").

Utah: *State v. MLC*, 933 P2d 380, 382 (Utah 1997) ("While we typically refrain from adjudicating moot questions, we recognize an exception to this rule where the alleged wrong is 'capable of repetition yet evading review.' " (Citation omitted.)).

Vermont: *In re PCB File No. 92.27*, 167 Vt 379, 380-81, 708 A2d 568, 569-70 (1998) (recognizing "capable of repetition, yet evading review" exception when the action's duration is too short to be fully litigated and there is a reasonable expectation that the same complaining party will again be subject to the same action).

Virginia: *Dep't of Taxation v. Delta Air Lines, Inc.*, 257 Va 419, 427-28, 513 SE2d 130, 134 (1999) ("Jurisdiction is not necessarily defeated * * * if the underlying dispute

\* \* \* is one 'capable of repetition, yet evading review.' ");
*In re Times-World Corp.*, 25 Va App 405, 412, 488 SE2d
677, 680-81 (1997) ("The Supreme Court has frequently
recognized that its jurisdiction is \* \* \* not necessarily
defeated by the practical termination of a contest which
is short-lived by nature. If the underlying dispute is
'capable of repetition, yet evading review,' it is not
moot." (Citation omitted.)).

Washington: *State ex rel. Yakima Amusement Co. v.
Yakima County*, 192 Wash 179, 184, 73 P2d 759, 762
(1937) (recognizing exception to mootness doctrine
when question is one of "great public interest"), *over-
ruled in part on other grounds by Schneidmiller &
Faires, Inc. v. Farr*, 56 Wash 2d 891, 355 P2d 824
(1960); *Federated Publ'ns, Inc. v. Kurtz*, 94 Wash 2d 51,
54, 615 P2d 440, 442 (1980) ("We have agreed, however,
to review otherwise moot cases if matters of continuing
and substantial interest are involved." (Citation
omitted.)).

West Virginia: *State ex rel. Jeanette H. v. Pancake*, 207 W
Va 154, 159-60, 529 SE2d 865, 870-71 (2000) ("A case is
not rendered moot even though a party to the litigation
has had a change in status such that he no longer has a
legally cognizable interest in the litigation or the issues
have lost their adversarial vitality, if such issues are
capable of repetition and yet will evade review.").

Wisconsin: *State ex rel. Jones v. Gerhardstein*, 141 Wis 2d
710, 723-24, 416 NW2d 883, 888-89 (1987) ("[T]his court
has carved out certain exceptions to this general rule
where: the issues are of great public importance; the
constitutionality of a statute is involved; the precise sit-
uation under consideration arises so frequently that a
definitive decision is essential to guide the trial courts;
the issue is likely to arise again and should be resolved
by the court to avoid uncertainty; or, a question is capa-
ble and likely of repetition and yet evades review
because the appellate process usually cannot be com-
pleted and frequently cannot even be undertaken
within a time that would result in a practical effect
upon the parties.").

Wyoming: *Davidson v. Sherman*, 848 P2d 1341, 1348 (Wyo 1993) (recognizing exception to the mootness doctrine when a case presents a controversy "capable of repetition yet evading review").